*237 The Chancellors being divided in opinion on the question made by the first ground of appeal, sent the case up to the Court of Errors for its. adjudication — and, after hearing argu-v ment, that Court decreed as follows.

Curia, per

Caldwell, Ch.
Mrs. Ann McCants made her will on the 17th of March, 1837, and a codicil thereto on the 25th of December following, and died in the year 1839; by the former, she devised and bequeathed, among other things, as follows : “ To Edward Mallory Burch, son of Edward Christopher Burch, I devise my house and lot in Savage-street, with the following reservation, that is to say : — reserving to Mrs. Burns, during her life, the occupation of the garret room she is now in ; and also reserving the southeast-ernmost extremity or portion of the said lot, which s.aid portion extends to the west, as far as the garden fence, and to the north, as far as a line drawn from the corner of the said garden fence, to the corner of the small building adjoining the stable, together with a right of way to the same through the garden — which said portion, with the said right of way, I do hereby devise unto my executors hereinafter named, or such of them as shall qualify on this my will, the survivors or survivor of them, in trust, nevertheless, for the use, occupation and benefit of my servant, Nancy, and her children, Louisa, Mary and Leah, it being her desire and intention to build a house on the same, for herself and her children, which she has hereby permission to do.
“ To my friends and executors, Edward C. Burch, Josiah Taylor and Robert R. Taylor, and the survivor of them, his executors and administrators, I leave my wench, Nancy, and her children, Louisa and Mary, and her future issue, by reason of her faithful services, and my wench Mary, a mulatto, and her child Augustus, and any other children she may have, with this special charge, that no other service or wages shall be required of them than may be sufficient to pay their taxes.
“ To Edward C. Burch, I give my land on James Island, adjoining Mr. Gerardeau’s and New Town Cut, containing about one hundred and forty acres, subject to the payment, within one year after my death, of the following legacies, malting in all seventeen hundred dollars.” The testatrix then proceeds to bequeath various pecuniary legacies, and among them, “ to Louisa and Mary, children of my wench Nancy, one hundred dollars a piece, to be employed by my executors for their education.”
By her codicil she devised and bequeathed, among other things, as follows:
“ In the first place, I revoke and make null the devise of the southeastern extremity of my lot in Savage-street to my *238 executors, with the trusts therein mentioned, and in lieu thereof, I give, devise and bequeath to my said executors another portion of my said lot, measuring in depth from Savage-street, twenty-five feet, and in width thirty feet, bounded on the west by Savage-street, and on the south by lands of the estate of William Rivers. I give Nancy twenty dollars for a mourning suit.”
7 Stat. of S.C, 442, 443.
“I also give my negro girl Leah to my executors, with the same trusts as specified concerning Nancy, her mother, and her sisters Louisa and Mary. I also give to the said Leah the sum of one hundred dollars, payable (as the legacies to her mother and sisters) by Edward C. Burch.”
The matters of account were referred to one of the Masters, and on the coming in of his report, the defendants filed various exceptions thereto, but only one question, arising out of the sixth exception, has been submitted to the Court of Errors; that exception was, “ that he erred in deciding that certain provisions made in the will of the testatrix, for the benefit of some of her slave's, are illegal, and that the benefit of these provisions sinks into the residuum, and are to be distributed as in case of intestacy: whereas it is submitted that the provisions of the will are not illegal, or if they were they would not enure to the benefit of the statutory distri-butees of the testatrix.” This exception was overruled by the Chancellor who heard the cause on the circuit, and the defendants on the apppeal insist “ that so much of the decree is erroneous as declares that the bequests of certain slaves to the defendants, are rendered illegal and void by reason of certain benefits directed by the will of the testatrix to be allowed to the said slaves, and that certain small pecuniary gifts to the said slaves, are also illegal and void, and therefore that the defendants must be considered as holding the slaves and their issue for the distributees and next of kin of the testatrix, and, as it would seem, are not justifiable in delivering to the said slaves the pecuniary gifts directed by the will: whereas it is respectfully submitted, 1. That the pecuniary gifts to the said slaves, and other provisions directed for their comfort, violate no law whatever, not even the Act of 1841, but are as consistent with the laws of South Carolina as they are with the dictates of humanity. 2. That the directions contained in the will, relative to the time and services of the said slaves, are conditions of the bequest to the defendants, and not trusts, and being conditions subsequent do not invalidate the gift. 3. That even if these directions be regarded as trusts, they were not illegal at the death of the testatrix, and cannot be rendered so by the subsequent enactment of the Act of 1841.”
Before the Act of 1800, an owner had a right in South Carolina, to emancipate his slave in any way he might see *239 fit, without restriction. That Act prescribed a mode, and provided in case any slave was set free, otherwise than according to it, “ it shall and may be lawful for any person whosoever, to seize and convert to his or her own use, and to keep as his or her property, the said slave so illegally emancipated or set free.”
The Act of 1820 created an additional restriction upon emancipation, by enacting “ that no slave shall hereafter be emancipated, but by Act of the Legislature.” These were the only laws limiting the powers of the owners of slaves as to emancipation, when the testatrix made her will and died. Since then, in 1841, an important change has been made by an Act which, among other things, provides that “ any bequest, gift or conveyance of any slave or slaves, accompanied with a trust or confidence, either secret or expressed, that such slave or slaves shall be held in nominal servitude only, shall be void and of no effect; and every donee or trustee, holding under such bequest, gift or conveyance, shall be liable to deliver up such slave or slaves, or held to account for the value, for the benefit of the distributees or next of kin of the person making such bequest, gift or conveyance.”
The first enquiry is, was the bequest of Mrs. McCants, of the slaves in controversy, to the executors, lawful in 1839 1 And secondly, what interest or estate did they take 1 These questions naturally precede those that may arise under the doctrine of trusts, which has been discussed in the circuit decree.
At the time testatrix made her will, there was no law that restricted the owner of a slave from bequeathing, giving or conveying a slave, with a trust or confidence, either secret or expressed, that such slave should be held in nominal servitude only: if it had been otherwise, why pass this clause of the Act of 1841 ? Nor can it be said that it was declaratory of what the law was before that time, as neither principle or case can be adduced to establish such a proposition. The object of the Act was to suppress and prevent a great and growing evil, which had counteracted, to a considerable extent, the effects intended to be produced by the Acts of 1800 and 1820.
But these Acts were not framed to cover the case of one person transmitting to another the title of a slave with a trust of nominal servitude ; for although the slave might be as free from service as his master, yet he was, nevertheless, a slave and subject to all the disabilities and servitude of his condition — he was liable for his master’s debts — subject to sale, passed as chattels in case of intestacy, and might be bequeathed to another owner. Such a trust could not be enforced in any Court, in favor of a slave, and depended for its execution upon the mere will of the donee. In the pase of *240 Cline v. Caldwell, the Court held that the deed of a slave, a]DS0]ute on its face, but with a secret trust, to let the negro go at large as a freeman, or with a view to future emancipation, was no violation of the Act of 1820, and was obligatory between the parties; until emancipation takes place the right of property remains in the grantee. There the conveyance was mat^e by the owner of the slave John, to the plaintiff, who was a free negro, the wife of John, and her rights were protected. But,if the owner, without a formal act of emancipation, permits his slave to go at large, and to exercise the rights and enjoy all the privileges of a free person of the slave would become liable to be seized under the Act of 1800, and the owner could not maintain trover for him without previously seizing him under the Act. Nor is a slave liable to capture, unless the owner parts with the possession, and permits him to go at large and act for himself.
1 Hill Rep. 423.
Linam v. Johnson Bail R. 137 ’
Lenoir v. vester, i Bail. R. 032.
2 Hill Cli. Rep. 314.
In the case of Frazier v. Frazier's executors, which was decided in 1835, the Court laid down the principle that the owner of slaves may, by his last will, direct his executors to dispose of them in any way he could; and as he could, in his lifetime, have removed his slaves to another State, and there have emancipated them, he might, by will, direct his executors to do so; and they were accordingly ordered to remove and emancipate them.
The second enquiry is, what estate did the executors take in the slaves under the will ?
From the terms of the bequest, it appears the whole estate that the testatrix had in the slaves, was left to and vested in the executors, who are entitled to their absolute ownership.
If the slaves had not been given to the executors without limitation or reservation, and the title had been left where the law vests it independently of the bequest, then the sole right of the executors would have arisen from their representative character, which would clothe them with nothing but a trust; but here they are vested with the legal estate ex vi termini, as legatees, and the alleged trusts merely amount to advice, which they may or may not follow as they see fit. If the testatrix had not bequeathed the slaves to any one, but required her executors to perform the trusts, by paying them their legacies, and permitting them to live free of service or wages, except what might be sufficient to pay their taxes, it would have constituted a very different case from the present, where she has transmitted the whole legal and equitable estate to the executors as legatees. The executors took possession of the slaves, and became their owners to all intents and purposes before the Act of 1841, disincum-bered of the supposed trusts, which clearly fell within that class of duties that are denominated by writers on ethics, imperfect obligations, such as cannot be enforced either in *241 law or equity : neither the slaves or any one for them could set up their claims under the will, and whatever legacies or benefits were bequeathed to them, either belong to or can be controlled by their masters, and as far as the slaves are concerned, have no more weight than if such provisions had never been made in the will.
1 Domat. 45, Sec. 1 advicé the use of rules.
1 Domat. 5, sec. 15.
Taylor’s Civil aw’168'
As soon as the executors took possession of the property the testatrix, paid her debts and assented to the legacies, all the valid subsisting trusts, connected with these slaves and the bequests left to them, were executed and terminated, and there was nothing upon which the doctrine of indefinite and void trusts, when no personal benefit is bestowed upon the executor, can operate so as to create a resulting trust in favor oí the next of kin. We are not disposed to controvert the views of the circuit decree on this subject, but we think they are inapplicable to this case. The title, both legal and equitable, in the slaves, having vested in the executors and legatees, before the passage of the Act of 1841, there was no such trust in existence as it contemplated, upon which it could attach. The civil law made a material distinction between natural and arbitrary laws : “ the former being taught by nature and reason, have of themselves justice and au> thority, which oblige the people to obey them,” but the latter are “ as facts naturally unknown to man, and which are not binding until they are promulged; from whence it follows "that natural laws regulate both the time to come and the time past, but arbitrary laws have their effect only tor the time to come, and it is to give them this effect that they are put down in writing — that they are promulged, arid that they are recorded, to the end that no body may pretend ranee of them.”
“ As new laws regulate what is to come, so they may, as occasion requires, change the consequences that the former laws would have had; but this is always without prejudice to the rights that any persons had already acquired.” A learned writer, Dr. Taylor, commenting upon the principle, “ leges et constitutionsfuturis cerium est dare for mam nego-iies, non ad facta praeterita revocari,” says, “ the operation of law is naturally forward. Law is a direction of manners, prescribing what is to be avoided; but they are things in futuro only that can possibly come under that description, i. e. that can be avoided or not; for as no previous instituted law of man can prejudice or invalidate any future constitution, so no future constitution can operate to the prejudice of any past action. It is an equal absurdity, that law in the one 'case should valere ad ventura, or in the other ad praeterita.”
Speaking of the changes of law, he adds, “ the law giver cannot alter his mind to another man’s disadvantage, ox amend a law, which to another has created a right; and even *242 this restriction wants to be restrained itself, for as to that man, he is bound ; as to others, not. The whole of this is best seen by instance ; as it is a matter of indifference whether the State permits a man to dispose of his effects by will, or directs them in the channel of nature to the heir at law, I can suppose one of the directions altered on a sudden, and wills, for instance, to be declared of no force hereafter; here many things will meet my reader’s observation, which I have been discoursing upon above. 1. As either way of succession vel ex testimento, vel ab intestato, is indifferent, the law may direct either course indifferently, and change its mind uncontrollably.
“2. Those^who were in possession of property before, under the operation of a will, were in possession of a right which no power can defeat by the alteration of judgment.
“ 3. For if an alteration of judgment, in the. Legislature, can defeat a right created before then, a law can valere in praeteritum, which we have seen to be absurd.”
When the testatrix made her will and died, it was not un-lawfijJ. for a master to hold his slave in nominal servitude, or to give or bequeáth him to be held in that way ; but even then the execution of such a trust could not be enforced against the donee or legatee, the property became his absolutely, and it depended entirely upon his discretion whether he permitted the slave to enjoy the benefit of the provision or not, and neither he or any other person on his part could enforce it.
If all her interest and estate in the slaves, and the bequests to them, passed to her executors, the only question that can arise is, was there, notwithstanding this, such a valid and subsisting trust at the passage of the Act of 1841, upon which it could operate ? If the character of the alleged trust was merely advisory, and could not have been enforced before the Act, it would seem to have no existence either in law or equity, and being a nullity was, therefore, not the subject of legislation. It cannot be controverted that the owner has a right to hold as loose a rein over his slave as he pleases, so that he does not part with his possession, and permit him to go at large as and to exercise the privileges of a freeman, and thereby to become derelict, and liable to be captured under the law. There is no limitation over after the estate bequeathed to the executors, and there is no ulterior reservation expressed or implied; the legacy is not left upon'condition, nor is it liable to forfeiture, but its terms are amply sufficient to convey all the estate the testatrix had in the slaves. Her object seems to have been to invest her executors with all her rights in relation to the slaves, and to induce them to pursue the same course that she, if living, would probably have adopted for the government, protection, *243 and principally for the comfort of the slaves, and the executors have not forfeited their rights as absolute owners, from their faithfully fulfilling the wishes of the testatrix, neither would they have done so if they had subjected them to the severest servitude, and appropriated the legacies left them to their own use •; their course has depended upon their will and pleasure, and not upon any obligation arising out of the will that can be enforced either in law or equity. This view enables us to steer clear of the question as to the validity of retrospective laws.
Lit. 4th, p. 228.
Kent’s Com.
As early as the time of Bracton, the maxim nova constitu-tio futur is forman imp oner e debit et non praeterites, (which was borrowed from the civil law,) was incorporated into the common law, and seems to have received the united sanction of every elementary writer, down to the time of our own commentator, Chancellor Kent, who says, “ the very,essence of a new law is a rule for future cases.”
Some of our sister States have, by their constitutions, specially provided against the passage of such laws, and the general tenor of our institutions is to restrict the law making power to the future. A strict construction of the powers of the different departments of government, and of the laws that are adopted, and an inviolable regard for vested rights, are among the strongest securities that can protect property and perpetuate our institutions.
The retroactive effect of an Act upon the ' past, would involve the exercise of not only legislative but judicial power ■; for instance, a new character would be given to such a bequest, by declaring it illegal, and then another rule applied, making the property distributable.
But we are not left to feel our way through abstractions to the correct conclusions on this subject; from the current of our own cases, we can derive probably the most satisfactory arguments, and the most weighty authority.
This case is clearly distinguishable from Lenoir v. Sylvester, for there the executors might lawfully have carried out the testator’s intention in emancipating the slaves before the Act of 1820; but as they had failed to do so, and that had intervened and prevented them from accomplishing it after-wards, the estate of remainder, after the interest of the tenant for life had been exhausted, became intestate property and enured to the benefit of his next- of kin.
So in the case of Gordon v. Blackman the bequest was not as in this ease to the executors, but that the slaves should be hired out by the executors until a sufficient sum should be raised from their hire to pay testator’s debts ; that they should, then, apply to the Legislature to procure the emancipation of the slaves, and if they should fail to procure such Act then to carry them to the nearest non-slaveholding State *244 or to Liberia. Before a sufficient amount had been realized from the hire of the slaves, to pay testator’s debts, the Act of 1841 was passed, which intercepted the execution of that part of the will that directed the slaves to be carried to the nearest non-slaveholding State or to Liberia, and rendered it unlawful, and it was held that a trust resulted for the testator’s next of kin: this case was decided in strict analogy to the preceding. But if- the testators had, in both these cases, bequeathed the slaves to their executors absolutely, these trusts would have been null and void.
11 Stat. of S. Carolina, 154.
Rice’s Law Reports, 196.
Finley v. Hunter, 2 Strob. E, R. 218.
In Rhame v. Ferguson et al. the testator bequeathed slaves to his executor, and his executors and assigns forever, in trust, to permit them to apply and appropriate their time and labor to their own proper use, &c. and gave the residue of his estate, both real and personal, to his executor, upon the trust that the slaves and their issue should be permitted to use and enjoy the same forever ; and it was held that the effect of the will was to vest the legal title in testator’s estate in his executor, who had the right to take possession of the property and use it for the purpose of paying the debts of the estate, and then to do with it as he pleased.
Carmille v. Administrator of Carmille et al. is almost a perfect parallel to this case; the only difference is, there the conveyance was by deed, here it is by will; there the donor had parted with dominion over the property, and put it beyond his reach, and whatever estate he had had was transmitted to his donees, against whom his legal representatives could have no redress. The slaves were conveyed to Prin-gle and Chartrand upon the trust that they would suffer them to receive what they might obtain for their labor “ after paying the trustees the sum of one dollar per annum and no more.” Here the terms of the will convoyan absolute estate to the executors, and their title would probably have never been questioned if the Act of 1841 had not been adopted, and as that can have no effect upon such a bequest, the case must be decided independently of its provisions. In Car-mille’s case the second deed conveyed to the trustees two slaves for the use of other slaves previously conveyed to them, and. the Court held that as the trustees had the possession they had the right to say it was a naked conveyance to them, and that the trust was mere matter of advice and recommendation, which they may or may not regard. The same principles would seem to prevail when the gift had been made by will; for its construction must depend upon the existing laws, and it is always supposed to have been ipade in reference to them, unless there be some palpable re-pugnancy. When an ulterior interest was reserved orlimit- ' ed over, and an absolute bequest was made of slaves before ' the Act of 1841, no such inoperative trusts in favor of them can enure to the next of kin.
*245 It is, therefore, ordered and decreed that the circuit decree be reversed on this point, and that the slaves and the cies bequeathed to them, be the absolute property of the executors, to whom they belong under the will of the testatrix.
Richardson, O’Neall, Evans and Frost, JJ. and kin, Ch. concurred.
Withers, J. holding Court in Charleston.
Dargan, Ch. and Wardlaw, J. dissented.

Decree reversed.

The point submitted having been decided by the Court of Errors, and the case sent down to the Court of Appeals, that Court decreed as follows:

Per

Caldwell, Ch.
The Court of Errors having determined the question submitted to it, and having reversed the circuit decree upon that point, and the other grounds of appeal having been heard by this Court, it is ordered and decreed that the circuit decree be affirmed in all other respects, and the appeal dismissed.
The whole Court concurred.